## De Camp and others, overseers of the poor of the town of Tyrone, vs. Eveland.

The act of the legislature, passed April 17, 1854, erecting the county of Schuyler, (*Laws of* 1854, *ch.* 386,) was valid and constitutional. Johnson, J. dissented.

That act is not a violation of the 16th section of the 3d article of the constitution, although, being a local bill, it embraces in its title and provisions more than one subject; the several matters to which the act relates, and the provisions which it contains, being upon one and the same subject, within the meaning of that section of the constitution.

Neither is that act a violation of the 5th section of the 3d article of the constitution, which declares that every old county shall always be entitled to a member of assembly, and that no new county shall be erected, unless its population shall be sufficient to entitle it to a member.

The legislature, in determining the question of population, are not confined to the last state census.

The prohibition in the constitution is prospective, and refers to the population existing at the time of the erection of a new county.

The legislature are nowhere restrained, directed, or limited, in regard to the nature, grade, or character of evidence which they must have as the basis of their action, or to guide them in their decisions.

In some specific cases their power is limited, and in others conditional, depending upon the existence of certain facts. But they must necessarily decide whether such facts exist.

It is not to be presumed that the legislature have assumed the existence of a fact upon which an act of legislation is based, without evidence. On the contrary, courts are bound to presume that they acted upon good and sufficient evidence; and that presumption is conclusive.

There is no constitutional objection to the erection and organization of a new county, for municipal and judicial purposes only, until the next political arrangement and apportionment of representation can be constitutionally made; with provisions securing to the electors, in the mean time, the full enjoyment of the right of suffrage.

The constitution did not contemplate the decennial enumerations of inhabitants, therein directed, as the *bases* of all erections and divisions of counties thereafter to take place.

APPEAL from a judgment of the county court of the county of Steuben. The action was commenced in the county court, to recover several penalties incurred by the defendant for violations of the excise law, committed in the town of Tyrone. The complaint contained four counts or statements of causes of

action, each charging the defendant, being a resident of said town, with a violation of the law, in selling strong and spirituous liquor in said town, in quantities of less than five gallons at a time, to certain persons therein named, to be by them drunk in the defendant's dwelling house, situated in said town, the defendant not having a license therefor; specifying the times when the same were so sold, and the particular kind of liquor sold to each of said persons. The answer of the defendant denied each and every allegation of the complaint. Upon the trial, in the county court, at a general term thereof, held at the village of Corning, in the county of Steuben, on the 21st day of June, 1854, the parties waived a jury, and the issue was tried by the court. The defendant admitted that the plaintiffs were overseers of the poor of the town of Tyrone; he also admitted two violations of the statute, as charged in the complaint, in the dwelling house where he lived, known as the Wayne Hotel. It also appeared in evidence that the residence of the defendant, known as the Wayne Hotel, was situated in that part of the new county of Schuyler, erected by the act of April 17, 1854, which, by the same act, was set off from the town of Wayne to the town of Tyrone; and thereupon the plaintiffs rested. The defendant then gave in evidence, under objections by plaintiffs' counsel, the state census of 1845, showing, among other things, the representative population, at the time it was taken, of the several towns by name, comprised in the county of Schuyler. He also, under like objection, introduced witnesses who gave evidence touching the like population in April, 1854, of those parts of other towns which are annexed to towns embraced in the new county. To the admission of this evidence, on the part of the defendant, the counsel for the plaintiffs excepted. The defendant then rested. The plaintiffs thereupon offered in evidence the census of 1850, taken under the authority of the United States, for the purpose of showing the representative population of the territory embraced in the county of Schuyler at that time, and also for the purpose of showing the like population of the county of Chemung. The defendant's counsel objected to this evidence, on the ground that such census was not an

De Camp *v.* Eveland.

enumeration upon which the legislature could act in erecting a new county, and was therefore irrelevant and immaterial. The objection was sustained, and the plaintiffs' counsel excepted. The evidence was here closed; and the county court, after argument and deliberation, rendered judgment in favor of the defendant, with costs. From this judgment the plaintiffs appealed to this court.

*Geo. T. Spencer* and *D. J. Sunderlin,* for the appellants.

*Robert Campbell* and *D. Rumsey,* for the respondent.

WELLES, J. The decision of this case depends upon the validity of the act of the last session of the legislature, by which the new county of Schuyler was erected. (*Laws of* 1854, *ch.* 386.) If that act was constitutional, the plaintiffs in the court below were entitled to recover. That court rendered judgment in favor of the defendant, upon the ground that the act was in violation of certain provisions of the constitution. .

According to our republican theory, the whole power of government resides, primarily, in the people of the state. This power is usually denominated legislative, judicial, and executive or administrative ; the power to make laws, to interpret them and judge of their application, and to execute or administer them when thus made and interpreted. The people, by their organic or fundamental law, have transferred these powers, and distributed them into three departments, corresponding with the above mentioned division. By this organism of government, each department has annexed to the exercise of its functions certain restraints and limitations, a violation of which renders their acts, to the extent of the violation, inoperative and void. But, in each department, the power, circumscribed by the prescribed limitation, is supreme and absolute. The people have relinquished it altogether, and, for the time being, it is irrevocable. If the agents, to whom its exercise is committed, prove unequal to the task they have undertaken, or unworthy of the confidence reposed in them, the remedy of the people lies in a sort of reserved

power of periodical elections and appointments. The power to make laws is manifestly superior to that of interpreting or executing them ; and hence the legislative must, in theory, at least, be paramount in dignity and efficiency to the other two departments. The two latter occupy positions subordinate to that of the former.

In the consideration of the case now before us, we are to set out with the presumption that every state statute, the object and provisions of which are among the acknowledged powers of legislation, is valid and constitutional; and that such presumption is not to be overcome, unless the contrary is clearly demonstrated. (*Fletcher* v. *Peck*, 6 *Cranch*, 87. *Ex parte M'Collum*, 1 *Cowen*, 564. *Morris* v. *The People*, 3 *Denio*, 381 ; *and per Edmonds, J. in The People* v. *Newell*, 3 *Seld.* 109.) With the foregoing considerations in view, we will proceed to the examination of the objections urged against the law in question, which are founded upon its supposed incompatibility with the constitution. The first of these is, that the act, being a local bill, embraces in its title and provisions more than one subject, and is therefore in violation of the sixteenth section of the third article of the constitution. This objection was properly overruled by the county court. The several matters to which the act relates, and the provisions which it contains, are all clearly upon one and the same subject, within the meaning of the section referred to. Their object was the erection of the new county, and they are all subordinate and auxiliary to that. The reasons of the county judge, in his opinion which is furnished us with the case, are satisfactory upon this point.

The next two objections may be considered together. They are, that the territory embraced in the act erecting the county of Schuyler does not contain, according to the last state census, sufficient population to entitle it to a member of assembly ; and also, that the act reduces the representative population of Chemung county, by the same census, below the required ratio for a member; and is therefore a violation of the 5th section of the 3d article of the constitution. That section, near its close, contains the following provisions : " Every county heretofore estab-

De Camp *v.* Eveland.

lished and separately organized, except the county of Hamilton, shall always be entitled to a member of assembly, and no new county shall be hereafter erected, unless its population shall entitle it to a member." Both objections are founded upon the assumption that the legislature, in determining the question of population, are necessarily confined to the last state census, which was taken in 1845. Was that the only basis upon which they had the right to proceed ? Upon the correct solution of this question, the validity of the act erecting the new county very much depends. If the assumption is unwarranted, the principal objection to the act is disposed of. The prohibitory clause of the constitution above recited refers, as it seems to us, to the population at the time of the erection of a new county. The language is, " No new county shall be *hereafter* erected, unless its population *shall* entitle it to a member." This is manifestly prospective, not only in respect to the act forbidden, but also in relation to the state or condition of things, of which the prohibition is predicated. To justify the construction contended for by the defendant's counsel, it is necessary, after the word "population," to interpolate the words, "according to the last enumeration." This would be unauthorized, and is not required to make the provision harmonize with any other part of the instrument; and would, moreover, violate a well settled rule of interpretation, which requires us to gather the intention from the language used, and to understand the language according to the natural, ordinary and popular import. (1 *Story on Const.* §§ 400, 401 *and* 402.) Unless, therefore, there is some other section or provision of the constitution, or something obvious in its plan or scheme, inconsistent with the idea that the legislature may act, in the erection of a county, upon the amount of population existing at the time of their action, that view must prevail in the present case; and, upon that subject, we have not been able to discover any difficulty in the way. It is not claimed that the legislature are in terms forbidden to proceed upon the actual state of the population for the time being. Has it been, or can it be clearly shown that, by doing so, the spirit or meaning of the instrument is frustrated ? It is not sufficient for those who

question the power, to make out a probable case. Every reasonable doubt is to go in support of the action of the legislature. They may have acted unwisely, but it is not for the courts to inquire into the wisdom or expediency of their conduct. It is a simple question of power, which power is to be presumed, and unless clearly shown to be wanting, its exercise, no matter how objectionable, is to be upheld.

It has been urged, among other objections to the law under consideration, that the consequence may be, if it should be sustained, that at the next enumeration of inhabitants under the constitution, the territory embraced in the new county, as well as that of Chemung, may, one or both of them, be found so deficient in population as not to be entitled to a member of assembly according to the ratio of representation to be established by the legislature upon such enumeration, and the inequality of representation be thereby unnecessarily increased. To this it is a sufficient answer, that the same thing is liable to happen in respect to many of the other counties of the state. In this age of change, locomotion and emigration, it would not be surprising, if long established counties, whose population at the last census afforded a large fraction of representative population, should, by means of the arrangements and mutations of business, or the promptings of fancy or caprice, be reduced in population below the required ratio for a member of assembly. A great increase in one portion of the state, while other portions remained stationary, would tend to such a result. But the argument is an unfortunate one for the objector, as it proceeds upon the hypothesis that there has been, or will be, a decrease in the population of the territories embraced in the new county and in that of Chemung; while it is apparent that by adopting the census of 1845, if the hypothesis be true, the deficiency and consequent inequality would be greater than by proceeding upon the actual population, as it existed at the time of the passage of the act. If, on the other hand, the population of the proposed new county, or that of the counties from which it is to be taken, has increased since the census of 1845, it is equally obvious that its lines of boundary could be adjusted upon the basis of

De Camp *v.* Eveland.

the present population, with less danger of encountering the difficulty apprehended, than upon any other basis. If it has remained stationary in respect to numbers, it is just as safe and wise a basis to proceed upon in the one case as in the other. When a new county is to be erected, its population shall be sufficient to entitle it to a member of assembly. If not sufficient, then the constitution forbids the act. The population of 1845 was not, in all probability, the same as that of 1854. In 1845, it might have been sufficient, and in 1854, reduced below the representative ratio ; and the converse of the supposed proposition is equally true. The objection, however, is founded entirely in conjecture, and scarcely deserves a serious answer.

It is also contended that the plan and structure of the constitution contemplates the decennial enumerations therein directed, as the *bases* of all erections and divisions of counties thereafter to take place. But this is nowhere declared in the instrument, nor can it be shown by just inference or intendment, and the assertion must be regarded as gratuitous. Assuming that the legislature *may* adopt that basis, we are of the opinion they are not bound to do so. The county judge, in his opinion, which is certainly able and ingenious, adopts it as an undeniable proposition, and builds his strongest argument upon that assumption. Therein, as we conceive, consists the fallacy of his reasoning. His premises being wrong, the conclusions are necessarily erroneous. The original and primary object of the division of the state into counties was for judicial and municipal rather than political purposes. The mode of arranging practically the representation in the two branches of the state legislature and in the national congress, is secondary and subordinate, and has varied from time to time to suit the actual or supposed necessities or convenience of the people ; at one time the state having but four senate districts, afterwards increasing them to eight, and finally to thirty-two; formerly electing members of assembly by counties, and now by single districts ; and the same instability is predicable of the arrangement of judicial districts.

No one will deny that the erection and division of towns and counties, and the alteration of the boundaries thereof, are among

the acknowledged and appropriate subjects of legislation. This new county has been erected in the regular exercise of legislative power; and it does not appear that its territory is now, or that it was when the act was passed, deficient in representative population to entitle it to a member of assembly, nor that the population of the county of Chemung is thereby reduced below the required ratio for that purpose. It will be seen, by an examination of the act in question, that one new town is erected and the boundary lines of others are changed, thereby increasing the territory and population of some, and diminishing them in others. And although the new county does not divide towns as so erected and changed in their boundary lines, the boundary lines of the county do not follow the lines of towns as they existed at the last state census. If the legislature had the right to do this, as we think is undeniable, it follows that the last state census cannot show the amount of population of either Chemung or Schuyler, at the time such census was taken, nor at any subsequent date. And, independent of these considerations, it is obvious that it cannot show the population of any portion of the state, at the time of the passage of the act.

That it is competent, in establishing the boundaries of a new county, to follow the lines of towns as they are found at the time of its erection, must be true; as, otherwise the result will be liable to follow, that the lines of the county will cross and intersect town lines as they exist at the time, leaving towns lying partly in one county and partly in another. There is no escaping the force of this view, but by holding the power of the legislature over the subject, limited to the first session after an enumeration, and before any further changes are made in town lines. We cannot agree that the power is to be thus circumscribed by construction and inference.

It is also contended that there is no legitimate means by which the legislature can ascertain the actual present population of the territory to be embraced in a proposed new county, or of that of the counties from which it is to be taken. This objection supposes the legislature a subordinate tribunal holding jurisdiction under a superior power, and governed by establish-

De Camp *v.* Eveland.

ed rules of proceeding and evidence. Such a supposition, we think, is radically and fundamentally erroneous. The constitution declares that the legislative power of the state is vested in the senate and assembly. This legislative power is the very highest attribute of sovereignty, and its depositary the embodiment and concentration of the whole political force of the body politic, with such restraints only as the charter of government has imposed. It is the law-making power, and, as heretofore remarked, superior to either of the other departments of government. The legislature are nowhere restrained, directed or limited in regard to the nature, grade or character of evidence which they must have as the basis of their action, or to guide them in their decisions. In some specified cases their power is limited, and in others conditional, depending upon the existence of certain facts. But they must necessarily decide whether such facts exist. Their general power to prescribe and regulate evidence for every other tribunal in the state has never been questioned, and it would present a singular anomaly if they were wanting in power to do the same for themselves, or to alter and change the same at pleasure; and it would be equally strange if any judicial tribunal in the state were permitted to review their decision upon the question of fact, on the existence of which their power to legislate in a particular case is made to depend. If such a thing were to be tolerated, it is not perceived why the existence of the fact in question may not, and in many cases must not, be proper to be submitted to a jury. It is believed that but few would be bold enough to contend for a principle pregnant with such absurd results. In the present case it is contended that the legislature have assumed the existence of the fact, in reference to population, without evidence. But this does not appear, and is not to be presumed. On the contrary, we are bound to presume they acted upon good and sufficient evidence; and this presumption, from the nature of the case, must be conclusive. That we are not in possession of the facts or the evidence of them, which the legislature had, amounts to nothing in the argument. It is rare, if ever, that a

De Camp *v.* Eveland.

statute contains a recital of them, and is not necessary in any case.

Several objections were raised upon the argument, to the effect that the erection of the new county interferes with the present constitutional arrangement of judicial, senatorial and assembly districts. These objections. we think, are unfounded in fact. Those districts as now established are to remain the same as at present until after the next decennial state enumeration of inhabitants, when the legislature are required by the constitution to rearrange and reapportion them. (*Art.* 3, §§ 4 *and* 5 *of the Const., and* § 7 *of the act in question.*) This we think relieves the case from all constitutional difficulty of this description. We can perceive no objection to the erection and organization of a county for municipal and judicial purposes only, until the next political arrangement and apportionment of representation can be constitutionally made, with provisions securing to the electors, in the mean time, the full enjoyment of the right of suffrage; which we think the act in question has made. A principle analogous to this has been expressly held in the state of Massachusetts, and has been recognized in the state of Maine. In Massachusetts, as in this state, the constitution requires a census to be taken at the expiration of every ten years. In that state, members of the house of representatives are chosen by towns, and senators by counties. In March, 1851, the senate proposed to the supreme judicial court certain questions, to which an answer was returned, in which all the members of the court concurred; to the effect, that the legislature have constitutional power to change the boundary line of counties, by transferring or setting off any number of entire towns for all purposes for which counties are established, except that of constituting senatorial districts. That they also have the constitutional power to change the boundary lines of towns for all purposes other than those incident to the election of senators and representatives, although, by so doing, they change the boundary lines of counties; and in changing the boundary lines of towns by annexing part of one town to another, or by constituting a new town from one or more existing towns, the legislature may reserve and secure to

De Camp *v.* Eveland.

the inhabitants residing in each portion or portions, a right to vote, in the election of representatives, with the town or towns from which such portions are taken, until the expiration of the next preceding apportionment of representatives. (6 *Cush. R.* 578 *to* 583.) The opinion of the court fully sustains the foregoing abstract, and is here referred to, as a clear and convincing illustration of the power of the legislature upon the subject under consideration.

In an opinion of the supreme judicial court of the state of Maine, given in answer to questions submitted by the house of representatives of that state upon a kindred subject, the court, in conclusion, say : " The right of the legislature to incorporate a town, composed of parts of several other towns, is not intended to be denied or questioned. If not done at the time of a general apportionment, provision may be made that such inhabitants as are entitled to vote for a representative shall remain united to their respective districts for the election of a representative, until the next general apportionment." (33 *Maine R. by Reddington*, 587, 8.)

The 7th section of the act erecting the county of Schuyler, declares that the electors embraced within the new county, until after the next state census, shall continue to vote for members of the legislature and justices of the supreme court, as electors of the respective counties to which they have heretofore belonged, the same as if the act had not been passed. · If it should be objected that here is provision made for voting, only until *after* the next census, which may be completed before the general election of 1855, and if so, the electors of the new county may, to a certain extent, be disfranchised at that election ; the answer obviously is, that by a reasonable and fair construction of the section, the provision is to continue as long after the census shall be taken, as may be necessary to enable the legislature of 1856 to alter and rearrange the senate districts under section 4 of article 3, the judicial districts under section 16 of article 6, and to reapportion the members of assembly under section 5 of article 3 of the constitution. Such construction does not violate the letter, and is plainly the meaning of the section.

In section 4 of article 3 of the constitution, it is provided that no county shall be divided, in the formation of a senate district, except such county shall be equitably entitled to two or more senators; and section 4 of article 6 provides that judicial districts shall be bounded by county lines, &c. And it is contended that, as a necessary inference, the legislature are equally forbidden to divide senate or judicial districts, in the erection of counties. But this is a *non sequitur*. At the first session after the return of each enumeration, the legislature are to establish the districts; and in doing so, they are not to divide counties previously erected, as they shall then find them. This is all that is intended by the sections referred to. The argument of the defendant's counsel, if sound, would prohibit the erection of a county, unless under very limited restrictions, at any other time than at the formation of the districts.

For the foregoing reasons we are of the opinion that the law, erecting the new county of Schuyler, is valid and constitutional; and that the judgment of the county court holding otherwise should be reversed, and a new trial granted, with costs to abide the event.

T. R. STRONG, J., concurred.

JOHNSON, J., dissenting. I find myself unable to concur with my brethren in the conclusions to which they have arrived in this cause, and the subject under discussion is one of so much dignity, and the questions involved are of such importance in their bearing upon both public and private interests, that I do not feel at liberty to let the case pass with the simple expression of my dissent. Indeed, I doubt whether any judge could be regarded as having fully and faithfully discharged his duty, who should thus singly array himself against the judgment of the legislature and that of his associates, without assigning the reason on which his convictions are founded.

It is conceded on all hands, that the right of the plaintiffs to maintain this action, depends entirely upon the question, whether or not the act of the legislature of the 17th April, 1854, is

De Camp *v.* Eveland.

a valid, constitutional act. This is manifestly so ; because, although the legislature has the undisputed power to divide towns, and set off one part of one town to another, it is quite apparent that the division of towns was not the intent and purpose of the act, in any way, except as an incident to the arrangement of territory for the erection of Schüyler county. This being so, if the law erecting the county fails, the subordinate and incidental arrangement of the territory, with a view to the formation of the county, fails with it. I concede, in the outset, all that can be claimed in favor of the powers of the legislature of this state: that it is invested with the whole legislative powers of the people of this state, and represents their legislative sovereignty. That this power resides there, an inherent, as contra-distinguished from a mere donated power; and that upon all legitimate subjects of human legislation, the authority of the legislative body is unqualified, except in cases where it is limited and restrained by the constitution, which operates upon legislative power, as a limitation and boundary to its sovereignty, beyond which it has no power, if it attempts to pass. I grant also that the erection of new counties is among the ordinary and accustomed powers of the legislature; and that the act in question should, and must be sustained, unless it is found to contravene some express or clearly implied provision of the constitution. All intendments and inferences, *prima facie*, are to go to the account of the validity of the act, in the first instance; and it lies wholly with those who deny the validity of the enactment, to overcome the intendment and establish clearly the invalidity. Notwithstanding all this, and after the most careful and anxious examination and deliberation, my mind has been brought to the clearest and most undoubting conviction, that the act in question contravenes, in letter and spirit, several provisions of the constitution, and that it cannot be upheld without impairing seriously the integrity and authority of the fundamental law.

The county sought to be erected by the act, consists of what is, or was, portions of the territory of the counties of Steuben, Chemung and Tompkins, and includes parts only of assembly districts one and two in Steuben, part of Chemung which is a

single assembly district, and. part of the assembly district in the county of Tompkins. It also includes parts of senate districts twenty-five and twenty-six, and parts of judicial districts six and seven. The sixth section of the act provides that the territory embraced within the lines designated, " shall, from and after the passage of this · act, be for all purposes, except the election of members of the legislature, and justices of the supreme court, and for the holding and jurisdiction of the supreme and district courts, and courts of oyer and terminer, until after the next state census or enumeration, and thereafter, for all purposes whatever, a separate and distinct county of the state of New York." Section six provides that the electors of the territory embraced within the said new county of Schuyler, until after the next state census or enumeration, shall continue to vote for members of the legislature and justices of the supreme court, as ·electors of the respective counties to which they *have heretofore belonged*, the same as though this act had not been passed, but for all other purposes they shall vote as electors of the new county of Schuyler." The same section also assigns the new county to the twenty-seventh congressional district.

It will be seen by these provisions that when the next census shall be completed, which must I suppose be when the returns are all made as the act requiring it to be taken shall direct, from that moment the new county is to be a county for all purposes whatever, and the electors in the territory are to cease to be electors of the several counties to which they belonged before the passage of the act, for any purpose, and would have no right to vote for members of the legislature or justices of the supreme court in such counties, or elsewhere, should the census be completed before the. next election. No member of assembly is apportioned to this body of electors, nor could there be, by the legislature which passed this act, without the most palpable violation of the plainest provisions of the constitution, as seems to be implied in the exceptions referred to in section six; and as the county is not and could not be included in any existing senatorial or judicial district, the legislative and judicial sovereignty of these electors must necessarily remain unrepresented entirely,

between the period of the completion of the census and the new apportionment of members of assembly, and the new arrangement of judicial and senatorial districts, which can only be done by the legislature at its first session after the next enumeration. A very serious question, in my judgment, might be raised, as to whether the act should not be declared null and void, upon the ground that it may, if indeed it must not necessarily deprive these electors of the right to vote for a time, at least, for some of the most important officers which are to be chosen by the people. The constitution, art. 2, sec. 1, provides "that every male citizen of the age of twenty-one years, who shall have been a citizen for ten days, and an inhabitant of this state for one year next preceding any election, and for the last four months a resident of the county where he may offer his vote, shall be entitled to vote at such election in the election district of which he shall at the time be a resident, and not elsewhere, for all officers that now are, or hereafter may be chosen by the people." Can the legislature practically deprive a body of electors of this important right indirectly, for any period, by thus legislating them out of any assembly, senate, or judicial district, and leaving them with no representatives to choose ? I think not. But as I do not propose to place my dissent upon this ground, I shall not pursue it. There are other provisions and restrictions in the constitution, which in my judgment are more directly and palpably transcended by the provisions of the act, and to these I invite a careful and deliberate considerrtion.

*First.* The population embraced within the territory of the new county, did not entitle such county to a member of assembly at the time of the passage of the act, even conceding its numercial sufficiency. The constitution, article three, section five, declares, that "no new county shall be hereafter erected unless its population shall entitle it to a member." This is clear and explicit. Shall entitle it when? Clearly, at the time of the passage of the act. In this I believe all agree, at any rate the majority of the court put this construction upon it, which is obviously the true one. Certainly this provision cannot be construed as though it had read "unless its population shall at some

future day, one year or ten years hence, entitle it to a member." Did then the population, within the limits of Schuyler county, entitle that county to a member of the assembly at the time of the passage of the act? Clearly not. If it did, why was no member assigned to it? It was for the very reason that the population within its limits could give the county no title to one, that none was given. That body of electors had no right to claim a member for the new county, and the legislature had no power to apportion them one. The population formed part of the representative population of other counties, and entitled the other counties, to which they belonged at the passage of the act to the number of members of assembly apportioned to them respectively, and of course could, while that state of things lasted, entitle no other county to a member. This entire population belonged to assembly districts in other counties, and constituted the representative population of such districts, and they could neither detach themselves without removal from such districts, nor could the legislature detach them until the time should arrive when the constitution permits a new apportionment, and a new arrangement of districts, and this the constitution does not permit until after the next census. For any purpose of entitling Schuyler county to a member of assembly, this population might as well have resided without its borders, or been composed entirely of aliens, awaiting the period when they might legally obtain the right of citizenship, and of suffrage within the county.

It is insisted, however, that if the county at the time of its erection contained a representative population, sufficient in number to entitle it to a member, in case an apportionment could then have been made, the requirement of the constitution is satisfied. But this is not only a misreading of the text, but a misinterpretation of the spirit of the provision. It is not numbers alone, but the entire *status* of the population, to which the provision refers. Can it, according to the constitution and laws, and existing arrangements, not subject to alteration, serve as the representative population of the proposed county, and thus entitle it to a member? Undoubtedly one great object the framers

De Camp *v.* Eveland.

of the constitution had in view, was to prevent the erection of new counties which could not be represented in the legislature, and this I think is apparent throughout the whole scheme and plan of apportionment, and the organization of districts, assembly, senatorial and judicial. Hence the provision that when assembly districts are once formed by the supervisors, after one enumeration, they shall not be altered or changed for the next ten years, or until after another enumeration and this is immediately followed by the provision that every county heretofore separately organized, except the county of Hamilton, shall always be entitled to one member of assembly, and the provision forbidding the erection of any new county unless its population shall entitle it to a member. It will be seen that this provision imposes no restriction whatever upon the erection of new counties, composed of one or more entire assembly districts, within the same senatorial and judicial districts. In such case, the population of the county would entitle it to a member, whenever the act might be passed, between the period of one enumeration and apportionment and another.

The population of each separate assembly district is entitled to a member of assembly while such district shall last, and it entitles that territory to a member, and the legislature has no power to change the boundaries of the district, or to deprive it of the right to a member of assembly, when it once attaches between one enumeration and another. But the case is widely different where the attempt is made to erect a county out of territory belonging in part to several assembly districts. The case then falls within the exact language of the prohibition, and is, as I think, equally opposed to its spirit and intent.

Nor is the act at all relieved of the difficulty by the attempt to erect it as a county, for the present, for certain purposes only, and for all purposes, at some future uncertain day. The plain limitations of the constitution are not easily evaded by proviso and exception. The language of the prohibition is general, and extends to the erection of counties for any purpose, and for all purposes whatever. There is no exception or qualification in the language, and I know of no rule of interpretation by which such

exception as the one sought to be made in favor of this act can be implied.  But for this prohibition in the constitution, I see no good reason why the legislature might not, in the plenitude of its sovereignty, erect any number of counties for certain purposes other than that of being represented in the legislature, and enact that such counties should continue to be represented by the representatives of the counties from which they had been taken, and that the electors should continue to vote as the electors of such counties. But the exercise of legislative power must stop at the constitutional boundary, whether that be erected wisely or unwisely.

The case in 6 *Cushing*, 578, was much relied on by the plaintiff's counsel upon the argument. But I am unable to see its application to the case before us. It does not appear from that case that there was any such restriction in the constitution of Massachusetts as that I have been considering, and, independent of that, I should find no difficulty in agreeing with that case. But, under our constitution, I can see no way, nor do I believe one can be devised, by which a new county can be erected from parts only of different assembly districts, at any other period than that of a general reapportionment of the members of assembly, when a reorganization of the assembly districts becomes necessary, without coming into immediate conflict with some constitutional restriction.

*Second.* The boundaries of the twenty-fifth and twenty-sixth senatorial districts, and of the sixth and seventh judicial districts, divide the new county, and the constitution plainly forbids the division of counties in that manner ; and, as a necessary consequence, forbids the erection of counties to be thus divided. Art. 3, sec. 4, of the constitution, provides that no county shall be divided in the formation of a senate district, except such county shall be equitably entitled to two or more senators. Unless this provision, by plain and necessary implication, forbids counties to be thus divided in their erection also, it is the merest empty form of words imaginable. Of what avail would such a limitation upon legislative power be, if the legislature, the moment they had erected senatorial districts, and scrupu-

De Camp *v.* Eveland.

lously bounded each by county lines, in obedience to the letter of the constitution, could turn around and erect new counties embracing territory on each side of such boundaries, and enact that the counties thus erected should remain divided by such district lines for the next ten years, until another enumeration and arrangement of senatorial districts. None, as it seems to me, can fail to see that the constitution would be just as much violated in the latter case, as though counties had been divided in the formation of senate districts. The provision is not a mere idle form of words. It was made part of the organic law, for a purpose deemed to be important by those who framed it, and can no more be violated in its spirit than in the letter. The scheme of the constitution plainly is, to secure and guaranty to every body of electors residing in the same assembly district, and in counties entitled to only one member of assembly, always complete unity of representation in each branch of the legislature ; and hence no assembly district can be formed from parts of two counties, and no county, unless it is entitled to more than one senator, can be divided, in forming senate districts. All the electors in an assembly district are to be represented at all times, in the legislature, by the same member of assembly and the same senators. Here, too, the prohibition is general, "no county shall be divided ;" all counties are included, whether erected for one purpose or another, or for all purposes.

The same considerations apply to the act, in reference to judicial districts. The constitution, art. 6, sec. 4, provides that "the state shall be divided into eight judicial districts, of which the city of New York shall be one ; the others to be bounded by county lines." The judicial districts, according to this provision, are to be bounded by county lines, not only in their formation, but in their continuance. What was the object of this ? Clearly, to prohibit and prevent just what this act is calculated to establish and promote, the inconvenience and incongruity of having different portions of the territory, and of the population of the same county, belong to different judicial districts, and subject to the cognizance and jurisdiction of different tribunals of oyer and terminer. The incongruity of such a state

of things was too palpable to be overlooked by the framers of the constitution, and it remains to be seen whether the legislature can do, indirectly, what the constitution is so careful to prohibit.

The constitution provides, in substance and effect, that the entire territory and population of each county shall be within the boundaries of a single judicial district, and subject to the jurisdiction of the same court of oyer and terminer. This act provides, in substance and effect, that until after the next enumeration, one part of Schuyler county and its population shall belong to the seventh judicial district, and another part to the sixth; and other parts shall be subject to the local jurisdiction of three separate courts of oyer and terminer.

The act also, if valid, blots out former county lines within its borders, so that they can no longer serve as the boundary lines for senatorial and judicial districts, which the constitution plainly requires and intends. It is idle to suppose that the plain, clear, substantial provisions of the constitution can be thus paltered with and evaded, by enactments which, in one view, and for one purpose, create the clear, plain, organic form and substance of a county, but in another aspect, and for another purpose, make it a mere chimera, a dissolving view. It is either a county, by the terms and provisions of the act, or it is not. And if the act makes it a county at all, then the act contravenes both the letter and spirit of the constitution, and is void.

Whether, by the exceptions in section six of the act, it was intended to exclude this court from sitting and exercising its accustomed jurisdiction within the borders, or at the seat of justice of Schuyler county, until after the next enumeration, I do not now care to inquire. I take it for granted, that the legislature has no power to shut out and exempt any portion of the territory of this state from the jurisdiction of this court. This is a court of general jurisdiction, with powers original and inherent, which the legislature can neither take away, nor substantially abridge. The constitution, which distributes the entire sovereignty of the people, deposited the judicial sovereignty

De Camp *v.* Eveland.

with the courts, in the same manner that it did the legislative, with the senate and assembly.

*Third.* The territory does not embrace a sufficient population, in point of numbers, to entitle the county to a member; and Chemung county is reduced below the ratio for a representative. On this head it will scarcely be necessary for me to do more than to refer to the very able and elaborate opinion of the county judge, which seems to me entirely conclusive. I assume that a state census is the only basis upon which the apportionment of members of the assembly, and the arrangement of territory for the purposes of assembly districts, and new counties, for the purpose of being represented in the assembly, can be made. This I am aware is denied; but it seems to me the proposition can be clearly established. The present apportionment of members was made under the census of 1845, before the adoption of the present constitution, except so far as relates to the division of counties into single districts, which was done by the board of supervisors in January after its adoption. The framers of the constitution themselves erected the senate districts as they now exist, and provided for an enumeration of the inhabitants in 1855, and at the end of every ten years thereafter, and an alteration of such districts by the legislature at its first session, after the return of every enumeration. The convention, it is clear, acted upon the census of 1845, and adopted the apportionment of members among the several counties, which the legislature had, before that time, made upon the basis of that census; and by the constitution they provided, that the several boards of supervisors in such counties as were then entitled to more than one member, should assemble on the first Tuesday of January thereafter, and divide their respective counties into assembly districts, equal to the number of members of assembly to which such counties were then severally entitled by law. Each district was to contain, as nearly as might be, an equal number of inhabitants, " according to the last preceding state enumeration." The constitution then provides that the apportionment, and districts so to be made, shall remain unaltered until another enumeration shall be taken. It also con-

De Camp *v.* Eveland.

tains the same provision in reference to the senate districts. Here there are arrangements, under the authority and in pursuance of the requirements of the constitution, upon the basis of the enumeration of 1845, by which certain counties and districts are entitled to the members of assembly thus apportioned, and must continue to be so entitled until after the return of the enumeration of 1855. It is a right which the legislature has no power to change or take away until a specified period, to wit, its first session after the next enumeration ; up to that time they are to stand upon the basis of the former enumeration, and by virtue of the arrangement of the territory thus made. I understand it to be conceded, that the legislature, in making the new arrangement of districts, and the new apportionment of members of the assembly, at its first session after the enumeration of 1855, are to be governed and controlled by that enumeration ; and if this be so, it follows, as the inevitable deduction of logic, that any act of appointment, or any act by which territory is arranged, which would render the appointment of a member of assembly to such territory necessary in future, and with a view to secure it, founded upon any other basis or enumeration, would be of no avail, and void. The constitution leaves no room in which any other mode of determining the equality required in making apportionments can operate. No one, I apprehend, will contend for a moment, seriously, that the legislature, whose duty it will be to provide for the next arrangement of districts, and to make the next apportionment, will be at liberty to reject the enumeration to be taken in 1855, and proceed upon their own conjectures, or upon information they may have derived in some other way. But unless that legislature may do this, it is clear that no legislature can make any different arrangements intermediate the two enumerations in the same way, which can be upheld.

It is quite clear to my mind that the design of the constitution was, and is, that a decennial enumeration shall form the only basis and standard for apportioning members, and for ascertaining equality of members, as nearly as may be, until after anoth-

De Camp *v.* Eveland.

er is taken; and that until another, and so on, as long as the constitution stands. The constitution provides for an apportionment of the members of assembly among the several counties of the state, as nearly as may be, according to the number of their respective inhabitants, and it also provides in what manner the number is to be ascertained, and it seems to me every other method is, by every reasonable and fair intentment, excluded. And besides, if the legislature of 1854 could thus legislate in regard to existing arrangements, if they could make new combinations of territory out of existing districts for the future, and enact, as they have in this instance in effect, that the territory thus arranged shall have a member apportioned to it after the next census, what was there to hinder them, or what is to hinder any legislature, at any session, from arranging every district in the state in the same manner, in advance of the enumeration, and thus entirely forestall and foreclose the action of the legislature, upon which the constitution has devolved the duty of reorganization and reapportionment? Nothing whatever. And if this act can be made to stand, the constitution cannot. It is impossible for the two to move on harmoniously together. The harmony of the constitutional system is deranged, and may be entirely broken up and destroyed, if this experiment upon it is permitted to succeed.

If, as I have assumed, and briefly attempted to show, the census of 1845 is the standard for the legislature, and the only evidence to which they could legitimately resort for the purpose of ascertaining numbers in a case like this, it is clear that Schuyler county and Chemung are both deficient in population. And I shall take it for granted, without any extended argument, that the legislature has no more power to reduce an existing county below the ratio for a member, than it has to erect a new one, without a sufficient population to entitle it to a member. Each would be equally in derogation of the constitutional scheme of equality of representation. And if existing counties can be reduced at all below the existing ratio, they may be reduced, for aught I can see, to single towns. It is contended, however, by the plaintiff's counsel, that the court below had no evidence.

De Camp *v.* Eveland.

before it as to the state of the population in either Schuyler or Chemung, and was bound to assume that the legislature had not transcended its powers in passing the act. And it was insisted that courts cannot take judicial notice of a state census; but this I hold to be an error. It would be strange indeed if the enumerations provided for by the constitution, as the evidence upon which the legislative power is bound to act, which has the guaranty of official responsibility for its accuracy, and which, when taken, becomes part of the public history of the state, could not be noticed as evidence by the judicial power. I have no doubt, whatever, that courts can take judicial notice of the state census, whenever it is taken and completed according to law, and brought to their notice.

It is contended, also, that if courts can look to the census and take notice of it, it is as evidence of a fact to be established upon the trial, and that the court has no power to receive any evidence for the purpose of establishing the existence or non-existence of a fact, upon which the validity of a law is made to depend. The argument in brief is this: that wherever the right of the legislature to enact laws upon a given subject is limited to the existence of a certain state of facts by the constitution, the duty of inquiring, in regard to the existence of such facts, necessarily attaches to the legislature; and wherever the legislature ascertains, to its own satisfaction in any way, that the state of facts does exist, and proceeds to act, the constitutional limitation is removed, and the act must be regarded as valid, whether in truth the facts upon which their power to act depend did exist or not. And it is even said that courts are bound to presume that the legislature made inquiry, and ascertained, and are precluded from all inquiry and all proof to establish the contrary. In other words, that the legislative assumption of a fact is equivalent to its existence, and is conclusive evidence of its existence, and that an erroneous assumption is, for the purpose of upholding legislative authority, just as potent as an undisputed truth. This is a doctrine to which I can never subscribe. It is putting the constitution into the hands of the legislature entirely, and making them the sole and exclusive judges of their

De Camp *v.* Eveland.

own power. I am aware that some judges have gone quite far in this direction, and made unguarded expressions, which seem to countenance, to some extent, this doctrine. But it must have been, I think, without a due consideration of the duty of courts and the true nature of judicial power, and without considering the deplorable consequences to which such a doctrine may lead.

It is one of the first and highest duties of courts not only to construe and determine the import and meaning of all acts passed by the legislature, but to inquire and determine also when their enactments are within, and when they have passed beyond, the limits assigned in the constitution to legislative power. How can they discharge this duty if they are precluded from all inquiry into facts, upon which the right to exercise legislative power in a given case rests? But I do not care to pursue this subject. I trust that it will never be established as the rule here, without the most careful consideration of all its bearings and consequences.

I have thus imperfectly gone through with this case, and assigned the reasons which, though failing to satisfy others, in whose learning and judgment I have been wont to confide, have nevertheless produced the firm conviction in my own mind, that the act in question is in plain violation of the constitution. And while I trust I shall ever be found ready to uphold and to give free scope to all acts which the legislature, having the power, determines in the exercise of its discretion to pass, I shall never shrink from the duty of pronouncing their acts void, when in my judgment they are found to be in conflict with the constitution. I am accordingly of opinion that the decision of the county court should be affirmed.

Judgment reversed, and new trial granted.

[MONROE GENERAL TERM, December 4, 1854. *Johnson, T. R. Strong* and *Welles,* Justices.]