S. B. Strong, J.
The defendant was indicted, tried and convicted in the county of Chemung, for an offence committed in the town of Catharine, in that part of the former county of Chemung, now, and at the time of the perpetration of the crime, constituting a part of the contested county of Schuyler, and at a place confessedly more than five hundred yards from *43 the division line between the two counties. He was convicted at a Court of Oyer and Terminer, held in the county of Che-mung, and the conviction was affirmed at a general term of the Supreme Court in the sixth judicial district. Various exceptions were taken to the decisions of the Court of Oyer and Terminer in the admission of evidence, and to the charge to the jury, upon some points, and the refusal to charge as requested upon others. Hone of them seem to present any serious difficulty, except that relating to the organization of the county of Schuyler.
The indictment was for an assault with a deadly and dangerous weapon with an intent to kill. It was proved on the trial that there was a violent quarrel between the defendant and George Wickham, upon whom the assault was committed. The defendant told Wickham that he lied, and Wickham threatened to knock him down, and approached nearer to him for that purpose, when the defendant made an effort to stab Wickham with a knife, when Wickham retreated about a rod and the defendant followed, holding on to Wickham with one hand and stabbing him with the other between the eighth and ninth ribs, and at the left hip. A surgeon was asked on the trial, whether the wound on the chest endangered life. The question was objected to by the counsel for the defendant, but it was admitted by the court. It seems to me that the question was properly admitted. The witness was an expert, and the infliction of a dangerous wound was more indicative of an intent to kill than would have been one of a slighter character.
The court was requested by the counsel for the defendant to charge the jury that, if Wickham made the first assault, and the defendant, then having the knife in his hand, stabbed Wickham under such circumstances as would have constituted manslaughter if Wickham had died, he could not be convicted of an assault. Probably there is an omission in this part of the case. The counsel must have meant an assault with an intent to kill, otherwise the request would have been palpably absurd. But with that addition the court properly refused so to charge. *44 One description of manslaughter in the second degree is, the unnecessary killing of another while resisting an attempt by such other person to commit any felony, or to do- any other unlawful act. In such case there may have been an intent to kill, under an actual but erroneous impression that it was necessary, in order to prevent the commission of the unlawful act. Probably if the conflict in question had terminated in the death of the person assailed, and the defendant had been tried for murder, he would have availed himself of the supposed necessity to reduce the crime to manslaughter. Indeed, if the proof had shown an intent to kill that would have been his only defence.
The court was right in charging the jury, that it was to be presumed that the defendant intended the natural consequences of his acts, and that it was for them to say whether the defendant, at the time when he inflicted the wounds, intended to kill. It mattered not when the design was formed; whether sometime before, or at the moment. All that the statute requires is, that it shall exist at the time. The court was also correct in saying, .that even if the defendant had been justified in the first blow which he gave to Wickham, yet if he wrongfully and unnecessarily followed Wickham, with an intent to kill, he was as guilty as if he had struck the first blow wrongfully. The court, no doubt, meant so far as it related to the charge for which he was tried. There is no pretence that the assaults upon Wickham, when he was retreating, were in self-defence.
The only remaining material question relates to the organization of the county of Schuyler. If the statute purporting to organize that county was originally unconstitutional, and had not been confirmed by subsequent legislation at the time when the crime alleged against the defendant was committed (13th of June, 1857), or at the time of his trial (September, 1857), then the town of Catharine was still, de jure, a part of the county of Chemung; and the proceedings in that county were legal, and should be sustained: otherwise, not. The jurisdiction of our Courts of Oyer and Terminer, and of grand juries, is confined to their own county, and the territory of the adjoining counties, within five'hundred yards of its limits (2 *45 R. S., 205, § 29; 727, § 45). There are some exceptional cases, but they do not extend to the crime charged against the defendant.
The act to erect the county of Schuyler was passed on the 17th of April, 1854. The 6th section is in the following words: “All those parts of the counties of Steuben, Chemung, and Tompkins, which, after this act goes into effect, will be embraced within the towns of Orange, Tyrone, Reading, Catharine (including such parts of Newfield as was provided to be attached to Catharine, by chapter three hundred and twenty-seven, Laws of eighteen hundred and fifty-three), Dix, Cayuta, and Hector, shall, from and after the passage of this act, be, for all purposes except the election of members of the Legislature and Justices of the Supreme Court, . and for the holding and jurisdiction of Supreme and Circuit Courts and Courts of Oyer and Terminer, until after the next State census or enumeration, and thereafter, for all purposes whatever, a separate and distinct county of the State of New York, and shall be known or distinguished by the name of Schuyler; and the freeholders and other inhabitants of the said county of Schuyler, for all purposes (except as aforesaid), shall have and enjoy all and every the same rights, powers, and privileges as the freeholders and inhabitants of any of the counties of this State are by law entitled to have and enjoy, and not subject to be assessed and taxed by any of the counties from which they are by this act taken.” And the 7th section is as follows: “The electors of the territory embraced within the said new county of Schuyler, until after the next State census or enumeration, shall continue to vote for members of the Legislature, and Justices of the Supreme Court, as electors of the respective counties to which they have heretofore belonged, the same as if this act had not been passed; and for all other purposes they shall vote as electors of the new county of Schuyler; and they shall belong to, and form a part of, the twenty-seventh congressional district of the State.” By the 1st, 2d and 4th sections, additions were made to the towns of Orange, Tyrone, and Cayuta, from other towns *46 retained in the counties of Steuben and Chemung; and by the Sd section' a part of the town of Cayuta was erected into a separate town, which remained in the county of Chémting.
By the 1st section of the 3d article of our existing State Constitution, the legislative power of this State is vested in a Senate and Assembly. Ho portion of such power has been retained by the people, nor can it be exercised by them, as was decided by this court in reference- to the free school act of 1849. (Barto v. Himrod, 4 Seld., 483.) Under this constitutional grant (for I consider it as such, and not as a mere recognition of an original inherent right), the Legislature acquired the power to erect new counties. Whatever may be the rule in other cases, this power is no further restricted than by the people in their organic law. A restriction may be in direct terms or by implication. It is by implication in any case where its exercise would be in conflict with any other constitutional provision. But in the latter case, the discrepance must be organic, not merely such as may affect some unimportant detail. In other words, the objection, to be available, must extend to the vitality of the proposed measure. There is but one restriction in direct terms to the power to organize new counties. That is contained in a part of the 5th section of the 3d article of the Constitution, and is in the following words: “Ho new county shall hereafter be erected, unless its population shall entitle it to a member.” It is objected to the organization of the county of Schuyler that its territory did not, or that the Legislature did not legitimately ascertain that it did, contain the requisite population. It was contended that the census taken in 1845 furnished, and until the next decennial census of 1855 continued to furnish, the only legitimate evidence of representative population. I think that it was intended that such census should furnish the only criterion as to population in the reorganization of the judicial, Senate and Assembly districts. That is plainly to be inferred from the directions that such organizations shall be made at the first session after the return of any enumeration [art. 3, §§ 4, 5; art. 6, § 16), and so far as it relates to the *47 judicial districts at no other time, and as to the Senate and Assembly districts, no alteration can be made until the next enumeration. There is nothing in reference to the erection of new counties requiring that the extent of the required population should be fixed by the next preceding census. The requisition is general, that its population shall entitle it to a member. Ordinarily, the qualifications of an act apply to the time when it is to be performed. There can be no different criterion, unless some other time is mentioned. There is no direction that new counties shall be constituted only at the first session after an enumeration, as there probably would have been if such enumeration was to furnish the only guide. No one supposes that the Legislature, in the exercise of the power in question, is confined to any particular time. It is left to the legislative bodies to ascertain the population in the best way they can. In this case the preceding census would have been a very uncertain and imperfect guide. There had been no distinct enumeration of the inhabitants of the entire territory. Portions of several towns were included, and a part of one was excluded, and the number of inhabitants in each had not probably been separately returned or taken by the deputy marshals. According to a statement in the points submitted by the counsel for the people, the number of inhabitants in the several towns in the new county, in 1845, fell short of the requisite population for a Member of Assembly, to the extent of about two thousand eight hundred. But that did not include the parts of other towns which had been added. The Legislature was, undoubtedly, the appropriate tribunal to make the requisite inquiry, in order to ascertain whether their proposed act would be in conformity with the constitutional requisition. It is to be presumed that due inquiry was made, and the statute must be considered as a legislative declaration that the population of the proposed new county was sufficient. It was said that the postponement of the time when the county was to act as a new constituent of the election districts, was caused by a deficiency in the existing population, or by an apprehension in the Legislature that there was one. But that *48 is merely conjectural; and there was another palpable reason, which, according to the principles of logic, should prevail. The Constitution prohibited any alterations in the Assembly or Senate districts until after another census should be taken, and probably there was some apprehension that any change in the judicial districts until then, might be deemed objectionable. Undoubtedly, if the statute had contained a declaration that there was a deficiency in the population, it would have been/eZo de se. Nothing further would have been necessary to effect its nullification. I think that its virtual determination the other way, should be equally conclusive. Who could review .the conclusion of the legislative bodies on a question of fact? Certainly not a jury of twelve men. Nor can this court or any other judicial tribunal, assume, without proof, the existence of a fact for the purpose of nullifying a statute. It is true the Legislature may make a mistake as to a fact, or may willfully disregard the constitutional injunction. But all public functionaries, judicial as well as legislative, are liable to be mistaken, and yet questions must be submitted to them for their determination, and we must abide by the decision of those from whom there is no appeal, right or wrong. Then, as to a willful violation of the Constitution by the majority of those who have solemnly sworn to support it, that should not be presumed, A palpable disregard of a constitutional provision would soon work its own cure in a country where there are frequent elections, and the conduct of public men is, as it should be, subjected to a severe scrutiny.
I agree with the counsel for the people, that the Legislature has no more power to reduce an existing county below the ratio for a member, than it has to erect a new one without a sufficient population to entitle it to a member. That is not expressly prohibited by the Constitution, but it is apparent that it was the design that no change should be made in the organization of the counties which would, of itself, create a defective representation. But there is no evidence, except the census of 1845, which, of course, applied only to the time when it was taken, to show that the county of Chemung, and *49 none at all to show that either the comities of Steuben and Tompkins, was reduced in population below the required standard. On the other hand, the presumption, from the census of 1845, is, that the county of Chemung, as well as the counties of Steuben and Tompkins, were severally left with the requisite population. The number of the inhabitants of the county of Chemung was, in that year, 27,288, which exceeded the one hundred, and twenty-eighth part of the popu. lation of the entire State; and as the proportion of the number of aliens in cities greatly exceeds that in the rural districts, that county, no doubt, contained a considerably larger proportion of the representative population. ' The change from 1854, when the new county was created, to 1855, when the census was taken, could not have been very considerable.
My conclusions upon the questions as to the requisite population are, first, that the constitutional provision as to that had reference to the time when a new county should be erected, and not to any time antecedent or subsequent; second, that it is to be presumed that the legislature obtained and acted upon sufficient evidence; third, that there is no power in our judicial tribunals to review the conclusion of that body upon a question of fact; and, fourth, if such interference of the judicial with the legislative department had been warranted, a statute should not be annulled upon mere presumption. It is different "where a constitutional principle has been clearly invaded or disregarded, to the destruction or invasion of a private right. In such cases, it is undoubtedly competent for our courts, in adjudging upon such right, to declare the nullity of a statute.
The statute creating the county of Schuyler does not make any change in the territory of either the Assembly, Senate, or'Judicial districts. Each inhabitant entitled to a vote could still vote in the same district in which he had exercised that franchise before. He was not, therefore, immediately deprived of any constitutional right in that respect. He would still be, in fact, represented in the Legislature, and, if representation can be deemed applicable to the judicial department, in that *50 also. It is objected, however,' that this would be only until after the next State census, and that 'there might be an interval between the -completion of that enumeration and- - the reorganization of the districts, when the inhabitants of the new county could not vote- anywhere, nor be, in fact, represented in the Legislature. The word “ after,” as used in the statute, is quite indefinite. It may refer to the next moment following the completion of the census, or to the--time--when the Legislature-should act upon it in reorganizing the districts; Where a phrase is susceptible of two interpretations, by one of- which- there would' be a suspension, and by the other a continuance, of important political rights, the latter is undoubtedly to be preferred. But, at all events, if there might be a difficulty from ■ the interruption of constitutional rights, it would not be either an immediate or- a-necessary result. It would have béen prospective, and might have - been remedied by the Legislature. -A possible prospective objection, which might be removed, would not annul a statute at the time of its passage, nor repeal it when it should eventuate. It was undoubtedly incumbent upon the Legislature to reorganize the districts, as soon as that might be done after the State census. But if that body was remiss in performing that duty, its tardiness would not, nor would any of its effects,' so operate as to repeal a preexisting statute predicated upon a supposition that there -would be punctuality in conforming to its exigencies.
- It was contended on the argument, that the proposed organization was void, because it was without the immediate investment of all the legal attributes of a county. But what are the constitutional rights of which the county was deprived? The one mainly relied upon was, that every county is entitled to a Member of Assembly. The Constitution provides -that every county theretofore established and separately organized, except the' county of Hamilton, should always be entitled to one member of Assembly; but there is no provision that a new county should have a member immediately upon its creation. It is true, that it directs 'that no new county should be erected *51 unless its population should entitle it to a member. Mo doubt it was designed that a member should be assigned to the new county immediately, when that could be done without depriving other counties of their just representation. But there may have been, subsequent to the preceding census, such an increase in the population in the remaining part of the county or counties from which it is taken, as might well happen in such counties as Kings and Erie, and probably many others, that they could not properly be deprived of the then existing number of their representatives in the Assembly, and thus a member could not always be assigned to the new county, unless it should be erected at the time of a general organization of the Assembly districts. That the Constitution does not require; and it is probable that the omission to direct in positive terms that a new county should be absolutely entitled to a member immediately after its erection was from a disposition not to fetter the Legislature as to the time of the admission of new counties. Representation in the Assembly is not always, and representation in the Senate is never, a mere county right. Senators are uniformly, and Assemblymen are generally, elected by districts.
It was further contended by the counsel for the people that the statute in question would, if effectual, have caused the line between the twenty-fifth and twenty-sixth senatorial districts, and the sixth and eighth judicial districts to cross and thus divide the new county, contrary to two provisions of the Constitution. One of the provisions to which the counsel alluded is contained in the latter part of the 4th section of the 3d article, and is in the following words: “And no county shall be divided in the formation of a Senate district, except such county shall be equitably entitled to two or more Senators.” The other provision is in the first part of the 4th section of the 6th article, and is in the following words: “ The State shall be divided into eight Judicial districts, of which the city of Mew York shall be one, the others to be bounded by county lines, and to be compact and equal in population as nearly as maybe.” These provisions are undoubtedly mandatory upon the Legis *52 lature, and cannot be disregarded. The expressions “ formation,” in one of them, and “the State shall be divided,” in the other, show that they were intended to apply to the construction and general organization of the districts. They do not apply directly, nor do I see any reason why they should apply, to the mere consequences of some other action of the Legislature, and had at other times. I repeat that there is no reason to suppose that it was designed to fetter the Legislature as to the time when new counties should be admitted in any part of the State. But if a new county cannot be created when the district lines would divide it, and if the boundaries of the districts cannot be altered except at the general organization of the different districts, then there could be no construction of the proposed new county when it would consist of territory from the adjoining districts, except at the identical time of the adoption of one, and occasionally, as in this instance, of two organizations, which could be effected in only one out of ten years. Can the Legislature be thus restricted by mere inference ? The evils of having a county thus divided would, under the provisions in this instance, be inconsiderable, and but of brief duration. They are not of sufficient magnitude to authorize us (if anything could sanction the procedure) to strain a provision of the Constitution beyond the fair import of its language in order to avoid them. The facts of the case then present it in this position: The power of the Legislature to erect new counties is undisputed; it is not restricted as to time or place, nor in any respect except as to the required population. In the exercise of such power the Legislature has constituted the county of Schuyler; in doing so it has necessarily, and without being able to avoid the difficulty, contravened what may be presumed to have been the intent of the framers of the organic law in a comparatively unimportant particular. The acknowledged power and the presumed intent are antagonistic: which should prevail ? Most assuredly the former. In coming to a conclusion upon that point we have a right to consider the evil which would result from the prevalence of either alternative. The evils which would be con *53 sequent upon sustaining the statute are, as has been already stated, owing to its provisions, inconsiderable, and must be (or rather have been) of short duration. Whereas, should the act be annulled and the new county annihilated, the consequences would be disastrous. Titles to real estate and securities upon such property might be defeated; judgments in civil and criminal actions might be annulled; taxes for ordinary and necessary purposes might be vacated; vexatious suits might be sustained for invalid oficial acts; elections might be set aside, and various questions might arise as to the vaEdity of our recent State legislation. I do not deny the rule that, when the injunctions of the Constitution are positive, and consistent with each other, they must prevail, whatever may be the consequences; but where there is a discrepancy between the full pxercise of a power clearly conferred, and a supposed restriction upon it, the evils which would result from yielding to such restriction may weH be considered in deciding whether an act consummated under the power should be sustained or defeated. That the directions as to the constitution of the Senate and judicial districts had reference to the time of their general organization, and to no other, is, I think, plainly inferable from the requisition that the judicial districts should be equal in population as nearly as might be. Such equality may exist at the time when the districts are formed, but in the unequal progress in population of the different districts cannot continue for the next ten years. ' Thus, before the expiration of ten years from the adoption of the Constitution, and indeed when the next State census was taken, the population of several of the judicial districts exceeded that of one of the others by nearly two hundred thousand. If one of the directions could not be continuous, and the language as to that and the others is the same, the inference is plain that all referred to the time of the general organization, and were intended simply to control that operation. My impressions upon this point are, that the directions against the division of a county in the division of the State into Senate districts, and requiring that the judicial districts should be bounded by county lines, were peremptory *54 upon the Legislature in making the general organization, but that if the provisions had any application to other times, they were simply recommendatory, and that a non-conformity, and especially one that could not be avoided in the constitution of a new county at any such other time, would not be fatal to that measure.
The question as to the validity of the statute erecting the county of Schuyler, has been agitated before the Supreme Court in the sixth and seventh districts, and different decisions have been rendered. In the seventh district it was decided by the majority of a divided court, in December, 1854, that the statute was constitutional and valid. (De Camp v. Eveland, 19 Barb., 81.) In the sixth district .the decision (again by a majority of a divided court) was the other way. (Lyon v. Swan, Pamphlet Rep.) The date of the latter decision is not given, but it was some time after the judgment was rendered in De Camp v. Eveland. An elaborate and very able opinion of my brother Gray, in the case in the sixth district, is appended to the points in behalf of the people in this case. I have perused that opinion with much attention, but with great deference I differ from its conclusions. The authorities may thus far be considered as balanced.
If, however, the statute in question had been objectionable, on account of defects at the time of its passage,, it would be an important question whether the difficulties have not been removed by subsequent legislation. In an act passed on the 13th of April, 1857, apportioning the Members of Assembly of the State, one is allotted to “ the county of Schuyler” (Laws of 1857, vol. 1, 700), on the same day another act was passed constituting the Senate districts of the State, by which it was provided that the twenty-seventh district should consist of the counties of Chemung, Schuyler and Steuben (id., 702), and on the 15th of April, in the same year, an act was passed annexing the county of Schuyler to the sixth judicial district. (Laws of 1857, vol. 2, 30.) All of these enactments were made previous to the perpetration of the crime charged against the defendant. It has been objected to the acts constituting the *55 Assembly apportionment, and the Senate districts, that they were not passed at the first session after the return of the enumeration made in 1855, according to the direction in the Constitution. (Art. 3, § 4). That direction has not generally been considered so peremptory as to prohibit the performance of those acts at another time. It is apparent that no such restriction was designed, as to the time wnen such apportionment of Assembly districts and formation of Senate districts should be established, from the omission of a direction contained in the provision relative to the reorganization of the judicial districts (art. 6, § 16), that it should be made “ at no other time.” As to the judicial districts there could, of course, be no general reorganization of them in 1857. There is an essential difference between the prohibitions as to intermediate changes in the. Senate and judicial districts; as to the former they are to remain “unaltered” until the return of another " enumeration” (art. 3, § 4), but as to the judicial districts it is provided that they shall not be reorganized at any other time than that specially designated. What is the reorganization mentioned in the Constitution? Literally, it is of the entire State but probably it was meant to apply to each district. It appears to me, however, that it would be straining the obvious meaning of the word to include such changes in the district as must necessarily result from the erection of a new county, or the alteration of the boundaries of a preexisting one, or of a town, The addition to one county and subtraction from the other would not change the organization of either, certainly not within the meaning of the Constitution. It was well remarked by Judge Dentó, in the case of The People v. Draper (15 N. Y., 546) that “the business of the courts is with the text of the fundamental law as they find it. They have no political maxims and no line of policy to further or advance. Their only duty is the humble one of construing the Constitution by the language which it contains, and it was truly said by Judge Savage, in the case of ex parte McCollom (1 Cow., 550), that before the court will deem it their duty to declare an act of the Legislature void, a ease must be presented in which there *56 .can be no rational doubt. An act of the Legislature cannot be set - aside as unconstitutional, unless its incompatibility with the Constitution is manifest and unequivocal.” In that .case it was decided that a statute providing that justices of the peace, appointed for the county of Ontario by its county authorities, pursuant to the then existing Constitution, should, upon the erection of a part of its territory into the new county of Wayne, in which such justices resided, without any new appointment by the authorities of the new county, become justices of the peace of that county, was constitutional and valid; as the power to alter their territorial jurisdiction necessarily arose from the constitutional power of creating new counties. That was a strong case to show that one provision in the Constitution should yield to another, where it should be necessary in order to effectuate the more important object. I consider the two acts of April 13th, 1854, and of April 15th, 1857, as constitutional and valid. They contain distinct recognitions, by the appropriate organizing power, of the legitimate existence of the county of Schuyler, and they incorporate it into the State system in such a manner that it cannot now be severed without seriously disturbing, if not destroying, the entire organization. By the Constitution (art. 3, § 2), the Assembly must consist of one hundred and twenty-eight members. If the county of Schuyler should be blotted out, there could not be, under the existing apportionment, that entire number. Can an apportionment of but one hundred and twenty-seven members be constitutional ? and if not, did we have in 1858, or do we have now, a lawfully constituted Assembly ? If the apportionment of 1857 should be declared null and void, and the preexisting one should be restored, what would become of the additional members from the counties of Kings and New York, and several other counties ? If there" is no legitimate county of Schuyler, then the new assignment of districts in the county of Steuben, made by its supervisors, and the constitution of Assembly districts in the counties of Tompkins and Chemung, would be contrary to the provisions of the Constitution. These evils would be *57 of serious consequence, and their bare suggestion shows the propriety of the rule that where a new county was originally irregularly and perhaps unconstitutionally introduced, yet, when its existence is afterwards fully recognized by the legislative power, and it is so incorporated into our State system that it cannot be severed without seriously embarrassing the whole, and when, too, its defects are removed by subsequent legislation, such new county should be deemed and adjudged a valid and constitutional institution.
The judgment of the Supreme Court should be reversed ; the conviction in the Court of Oyer and Terminer should be set aside, and the indictment should be quashed.
Johnson, Ch. J., and Denio, J., delivered oral opinions. The Reporter’s notes do not enable him to discriminate accurately the remarks of one of those learned judges from those of the other. They said in substance:
By the actually existing arrangements of the government, Schuyler county is a constituent element of the State, the continued existence of which is indispensable to the existence of a government, according to the Constitution. It existing, Assembly, Senate and judicial districts exist, constituted in conformity with the constitutional provisions; so that a man, taking the Constitution in his hand, and looking only to the existing state of things, and not to the time at which the changes originated, would necessarily say that all the constitutional arrangements were complete and perfect.
If, on the contrary, it be now declared non-existent, the representation in the Assembly will inevitably become incomplete, and it may be doubtful how government could be carried on. It is at least clear that no arrangements could now be made which would be in harmony with the Constitution.
Both branches of the Legislature, and the executive departments of the government, have recognized the existence of the county, and it has entered as completely into every branch of administration as any other county in the State. While this *58 state of things has been being arrived at, a time has occurred when there was clear power in the Legislature, in strict conformity- to ■ the Constitution, to create the existing. state of things. ■. The difficulty proceeds from their having failed in duty.- Now, as to Senate districts and Assembly apportionment, they had power to act in 1857, as the neglect of their imperative, duty in 1.856 would, not make..void the apportionment of 1857.'
If, therefore, in 1856, the Legislature had made the present apportionment to take effect at the end of the session, relying, if you please, ,on subsequent action by the Legislature to-conform the judicial districts to the new territorial arrangements of the apportionment bill, a failure by the Legislature to pass an act reorganizing judicial districts would not make invalid the preceding act of apportionment. Nor should we then be reduced.to the necessity of declaring constitutional government at an end, by reason of a judicial district act not. having been passed. That would have presented a case, like the case of Boston Comer,[1] not within the language or the reason of the constitutional provision, nor within the mischiefs it was intended to guard against.' It is not a reorganization, but an act conforming the judicial arrangements to an actually existing state .of things, which state of things renders an -alteration of •the judicial districts necessary to keep up the scheme of the Constitution on that subject.
- The several acts of 1857, based on the independent existence of Schuyler county, and making its existence necessary to a *59 government in conformity with the Constitution, the recognition of that county by both branches of the Legislature, who have a direct and independent right of judgment on their own mode of being constituted, and the action of all branches of the government, except the judicial, have put a practical construction on the whole subject, which has removed it from that region of doubt within which alone it is competent and suitable for a court to declare legislative acts void, as conflict ing with the Constitution.
Comstock and Grover, Js., concurred in reversing the judgment, upon both the preceding opinions.

 Boston Corner is a small tract inhabited by some twenty families. It was originally in the southwest angle of Massachusetts, but being separated from the rest of that State by a mountain range, it was, on‘the petition of the inhabitants, ceded by Massachusetts - to New York by an act passed May 14, 1853. The cession was accepted by New York by an act passed July 21; 1853, and the consent of Congress to the transfer was given by its act of January 3,1855. The territory thereupon became a part of the State of New York, but it was not attached to any town or county, and no provision for that purpose or for the exercise of criminal jurisdiction was made until April 13, 1857, when the act (ch. 379) was passed, annexing the district of Boston Corner to the town of Ancram, in the county of Columbia.